## ANNA MAY DAKAN v. G. W. CHASE & SON MERCANTILE COMPANY, Appellant.

**Division One, June 19, 1906.**

1. **FACTORY EMPLOYEE: Origin of Fire: Evidence.** An employee in a manufacturing establishment destroyed by fire, resulting in her personal injuries, to recover damages for which she sues, must assume the burden of showing the origin of the fire to have been as charged in her petition, and that burden is not removed by testimony which leaves the origin to mere conjecture. But she is not required to prove it by the positive evidence of a witness who saw the first spark and what it kindled; it is held sufficient if she shows a condition of affairs, a combination of circumstances, from which reasonable men are justified in drawing the conclusion that the fire did occur in the way charged.

2. **ELECTRICITY: Expert Testimony: Cause of Fire.** Electric lights have come into such common use and the liability of the formation of a short circuit in a socket when the bulb is removed and the key is defective is so well understood that men whose daily experience has brought them into contact with such things are justified in forming opinions of their own based on well-known natural laws in regard to the origin of fire therefrom. The opinions of experts in such cases are instructive and valuable aids, but not necessarily conclusive on the minds of the jury, if to their own common sense experience they appear unreasonable.

3. ———: ———: ———: **Inferred.** The jury do not need expert testimony to tell them that an electric cord, often drawn over rough wood, dry and easily inflammable, would lose its insulation, and set the wood afire. Such use and surroundings are facts from which the origin of the fire may be inferred.

4. ———: **Incompetent Foreman: Imputed Negligence.** The knowledge of an incompetent employee put in charge of electric wires in a factory is the master's knowledge, and if he is not competent to appreciate the danger of using an electric lamp without a key by taking the globe off when the purpose was to turn off the light, and by putting the globe on to turn on the light, the fault must be imputed to his master.

5. ———: **Negligent Use: Degree of Care: Jury Question.** The law requires the master to use reasonable care in the use of electricity to protect the lives of his servants—the greater the danger, the greater the care. And an old factory building, filled with highly combustible materials, in which were employed 150 persons, most of them young women, working among bottles and furnaces on the upper floors, are facts to indicate the care the master should take for their safety, and the danger of fire from the use of electric wires and lamps among the combustible materials.

6. **FACTORIES: Fire Escapes: Statute: Common Law Liability.** The statute prescribing the number of fire escapes a factory must have does not relieve the master in any degree from his common law liability to exercise care to provide means for escape for his servants in case of fire, which is that he must provide such stairs, halls, doors, windows and fire escapes as would be reasonably sufficient for the egress of his servants in case of fire. The statute simply prescribes the minimum he must do to escape the penalty; but it does not relieve him of civil liability when he has simply done enough to escape that penalty.

7. ———: ———: ———: **Inspection.** Inspection and approval by the labor commissioner of the appliances which the statute says the factory master must provide for the safety of his employees, does not discharge the master from civil liability to them for failure to exercise the ordinary care which the dangerous circumstances require him to take for their safety.

8. **IMPUTED NEGLIGENCE: Defective Machinery: Knowledge of Assistant Foreman.** An instruction which imputes to the master the knowledge possessed by a sub-foreman who had charge of the laborers in the room where the defective electric light was, but had no supervision over the lighting apparatus, is erroneous, but that error will not justify a reversal, if the instruction also imputed to the master the knowledge possessed by the foreman, who had charge of the machinery and lighting apparatus, was the company's *alter ego*, and according to its evidence had possesseed knowledge of the defective light for sometime.

9. ———: **Unapplied: No Evidence.** An instruction on imputed negligence, which fails to direct the jury to find for plaintiff

Dakan v. Chase & Son Mercantile Co.

in case they find the servant failed of his duty in the particulars mentioned, should not be given, for it amounts to an abstract proposition of law. And where there is no evidence of the servant's negligence in the manner recited in the instruction, it cannot be said to be harmless error.

10. **NEGLIGENCE: Necessary Conclusion.** The instruction should not require negligence to be the "necessary" conclusion from the evidence. That is too strong. The law does not require the conclusion to be irresistible but the most reasonable and logical one that can be fairly drawn from the circumstances.

11. ———: **Fire Escapes: Instruction: Narrowing Issues.** There were two questions of negligence in the case, one relating to the origin of the fire, the other to the lack of sufficient fire escapes. Defendant's instruction was to the effect that if the fire had made such progress when plaintiff and her companions discovered it that the flame and smoke cut off their escape through the stairway, the door and the one fire escape, and that their only escape from death was to jump out of the window (by which plaintiff was injured), "then plaintiff can recover only on the ground that the fire was started by defendant's negligence." *Held*, that the instruction took from the jury any consideration of defendant's negligence in failing to provide sufficient fire escapes, and, in view of the fact that the building was full of highly inflammable materials, and a large number of girls were at work on the third floor, was erroneous.

12. ———: **Assumption of Risk: Pleading.** The negligence of the master is not one of the perils incident to the business which the servant assumes. If the peril of the servant in the performance of his duty is increased by the negligence of the master, and the servant, knowing the master's negligence and that it has rendered the performance of his duty more hazardous, continues in the service, a question of contributory negligence then arises, not a question of assumption of risk. The charge being negligence, the issue is raised by a general denial, and under that the master can show that he was not negligent and that the accident was an incident of the business conducted with ordinary care, which the servant assumed.

13. ———: ———: **Contributory Negligence: Obvious Danger: Question for Jury.** Whether or not the question of contributory negligence is one for the jury depends on the further question of whether or not the danger was so obvious that the servant, considering his capacity and opportunity, must have known and realized its degree, and so knowing continued in the service.

14. **MULTITUDINOUS INSTRUCTIONS.** Instructions overwhelming in number and volume tend to bewilder rather than to enlighten the jury. They should enlighten the jury as to the is-

sues they are to try and the law bearing on the case. And in this case it is held that if the trial court had refused all the instructions asked by defendant (44 in number) this court would have sustained the ruling.

15. **FIRE:** Expert Testimony: Insurance Agents. The testimony of expert witnesses, such as insurance agents, that fire insurance companies class candy factories as the most hazardous of all insurance risks, has no place in a case brought by a servant who jumped from a candy factory to avoid the fire and sues for injuries caused by the fall. When the condition of the buildings and the materials therein are shown, the jury is competent to judge of their inflammability. Expert testimony might be competent to prove the degree of inflammability of those materials in use which do not come within the common experience of men, but that does not belong to insurance men, whose testimony goes to the liability to fire of the establishment as a whole.

16. **BILLS OF EXCEPTIONS:** Matters Preserved in Term Bill: Reproduced In Abstract: Waiver. Motions to strike out parts of the petition, to make more definite, and to elect, overruled and exceptions thereto preserved in a term bill of exceptions, but not made a part of the transcript, and presented to this court only by being reproduced in the abstract, are not before the court for consideration. Besides, by subsequently pleading to the merits and going to trial, the exceptions to the ruling were waived.

Appeal from Buchanan Circuit Court.—*Hon. A. D. Burnes,* Judge.

REVERSED AND REMANDED.

*Thos. F. Ryan* and *Rusk & Stringfellow* for appellant.

(1) The demurrer to the case made by the evidence should have been sustained, and it was error to refuse it. 1. The burden rested upon plaintiff to show that defendant had been guilty of negligence which caused the fire. No inference of negligence on the part of defendant can be drawn from the fact that a fire occurred and plaintiff was injured. Catron v. Nichols,

81 Mo. 80; Baldwin v. Andrews, 96 N. W. 305; Dowell v. Guthrie, 116 Mo. 646; Smith v. Railroad, 37 Mo. 295; Fuchs v. City, 167 Mo. 620.  2. The burden rested upon plaintiff, and to entitle her to recover she must prove, not only the negligence of defendant, but that the negligence so proven was the proximate cause of her injury.  The causal connection must be proven between such negligence and such injury.  Harper v. St. Louis Co., 187 Mo. 575; Turner v. Barr, 114 Mo. 347; Goransen v. Ritter Co., 186 Mo. 300; Harlan v. Railroad, 65 Mo. 22; Settle v. Railroad, 127 Mo. 341; Trigg v. Lumber Co., 187 Mo. 575; Sidway v. Land Co., 163 Mo. 375; Plefka v. Knapp-Stout Co., 145 Mo. 318; Reedy v. Reaping Co., 161 Mo. 536; Oglesby v. Railroad, 177 Mo. 301; Halman v. Railroad, 62 Mo. 562; Slagg v. Railroad, 169 Mo. 497; Breen v. Cooperage Co., 50 Mo. App. 214; Reed v. Railroad, 50 Mo. App. 506.  3. There was no evidence tending to show that the incandescent lamp caused the fire.  The only defect in that lamp shown was that the key would not turn the electric current on to the lamp so as to light the lamp. (a)  But it is said that a "short circuit" occurred in this lamp, and that caused the fire.  Of this there is not a scintilla of proof.  No fact or circumstance tending to show the existence of a "short circuit" was proven.  It rests entirely on conjecture.  It is a mere, a sheer speculation, restored to by astute counsel in an attempt to account for the origin of the fire.  We challenge counsel to show any word in the testimony of any witness, or any fact or circumstances in the case, that has the slightest tendency to show the existence of a "short circuit" in that lamp.  "Verdicts must have evidence to support them, and must not be founded on mere theory and supposition."  Fetterling v. Railroad, 79 Mo. 509; Wood v. Railroad, 51 Wis. 201; Oglesby v. Railroad, 177 Mo. 295; Moore v. Railroad, 28 Mo. App. 627; Plefka v. Knapp-Stout Co., 145 Mo. 320; Dunleavy v. Iron Co., 85 N. W. 1025; Smith

v. Railroad, 37 Mo. 295; Callahan v. Warne, 40 Mo. 136; Breen v. Cooperage Co., 50 Mo. App. 214; Reed v. Railroad, 50 Mo. App. 506. (b) Even had the existence of a "short circuit" been shown by the evidence, that would not have shown that the "short circuit" in this lamp caused the fire. In attempting in this way to account for the origin of the fire, counsel claimed that the "short circuit" heated the cord by which the lamp was suspended until it became red hot, and the red hot wire started the fire. The proof showed that each lamp has a "fuse;" that fuses are a means of precaution used by electricians to insure safety against "short circuits" or "an overload" of the wire; and that defendant's lamps were properly fused with five-ampere fuses. It was further shown that to heat the wires in the cord red hot would require a current so strong that it would "burn out" or "blow" a 25-ampere fuse. There was not a syllable of evidence tending to show that the fuse did not perform its proper office. If the fuse was blown, or "burned out," that would cut off the current, so that there could be no current in that lamp, and the lamp could not start a fire. 4. There was no evidence tending to show that it was possible for the servants of the defendant to notify the girls of the existence of the fire, in time to enable plaintiff to escape through the factory and consequently no evidence warranting the submission of this issue to the jury. 5. But it is claimed that defendant is liable because it failed to provide a fire escape for its servants. The court required plaintiff to elect whether she would go to trial on her common law or upon the statutory action, and plaintiff elected to stand on her common law action. (a) At common law no duty rested on the master to provide fire escapes for his servants. Jones v. Granite Mills, 126 Mass. 84; Keefe v. Granite Mills, 126 Mass. 90; Rose v. King, 49 Ohio St. 13; Huda v. Glucose Co., 154 N. Y. 474; Schmalzareck v. White, 97 Tenn. 41; Keeley v. Conner, 106 Pa. St. 321; Sewall v. Moore, 106 Pa. St.

570. All the master was required to do at common law was to provide stairways and doors and windows for their ready egress in case of fire. This the defendant had provided in the most ample manner. (b) Again, the proof showed beyond any controversy that defendant had complied with the statute, and furnished a fire escape such as that law required. This fire escape was located at the point selected by the building inspector of St. Joseph, was approved by him, by Nordmeyer, the state factory inspector, and by Armstrong, his deputy, and by the chief of the fire department of St. Joseph. It was on the east wall of the factory, and all the employees on second and third floors worked in the east end of the factory. If plaintiff was suing at common law, surely a fire escape suitable and sufficient to meet the requirements of the statute would satisfy the common law. Sewall v. Moore, 106 Pa. St. 570; Huda v. Gluscose Co., 154 N. Y. 474; Keeley v. Connor, 106 Pa. St. 321. 6. "The proper inquiry is not whether the accident might have been avoided if one charged with negligence had anticipated its occurrence, but whether, taking the circumstances as they then existed, he was negligent in failing to anticipate and provide against the occurrence. The duty imposed does not require the use of every possible precaution to avoid injury to the individual, nor any particular means which may appear after the accident would have avoided it. The requirement is only to use such reasonable precaution to prevent the accident as would have been adopted by prudent persons prior to the accident." Fuchs v. St. Louis, 167 Mo. 646. 7. The evidence showed that plaintiff had worked in this factory for several years prior to the time she was injured, and that she was thoroughly familiar with the buildings, the manner in which defendant conducted its business and the means provided by the defendant for the escape therefrom of its employees in the event of fire. Plaintiff having continued in the employment with full knowledge of all

these facts, assumed the risks and dangers incident to the contingency that a fire might occur before working hours and at a time when she was in the dressing room. It was purely a possible contingency. This risk she assumed. Huda v. Glucose Co., 154 N. Y. 481; Bradley v. Railroad, 138 Mo. 293; Fulger v. Bothe, 117 Mo. 475; Holloran v. Foundry Co., 133 Mo. 470; Steinhauser v. Spraul, 127 Mo. 562. We do not contend that plaintiff assumed the risk imposed upon the defendant by law of providing for its servants a reasonably safe place under ordinary and normal conditions, but we do urge upon the court that this defendant was not required to anticipate and provide for extraordinary dangers and perils which might happen. Huda v. Gluscose Co., 154 N. Y. 481. (2) The court erred in admitting in evidence, over defendant's objection, the testimony of insurance agents to show that candy factories generally were classed as extra hazardous risks. Conner v. Railroad, 181 Mo. 418; Gobel v. Kansas City, 148 Mo. 470; Edwards v. Asphalt Co., 92 Mo. App. 281; Tomville Co. v. Weiss, 76 S. W. 356; Jewell v. Fitter Co., 200 Ill. 382; Van Ravensway v. Ins. Co., 89 Mo. App. 73.

*James W. Boyd* for respondent.

The case was tried properly and without any reversible or material error; the judgment is for the right party, and should be affirmed. (1) Appellant's point that a demurrer to the evidence should have been sustained is not supported by the facts or law. (2) Under the evidence the question of defendant's carelessness was, beyond all reasonable controversy, proper to be submitted to the jury. (3) The list of authorities cited by appellant on this subject may contain legal principles, as all law books do; but we submit that they are not in point on this issue in this case. (4) Thirty-one of those references might do duty in any brief in any suit at law on the part of any defendant who had

appealed his case. (5) How defendant can hope to
maintain its assertion that there was no evidence tend-
ing to show that the defective electric lamp caused the
fire is beyond conjecture. The facts and circumstances
shown in evidence tend to prove that it did. But even
if there had been no proof of that fact, still this was a
case for the jury on other grounds. (6) Respondent
denies the correctness of appellant's assertions regard-
ing the facts under this head. (7) There is no proof
that the girls were the first to discover the fire, al-
though appellant asserts they were. Its assertion is
not sustained. (8) Plaintiff's case is meritorious.
The verdict is small; less than it should be. The judg-
ment is for the right party. There is no real defense,
was none in the circuit court, is none here. (9) No
error is ground of reversal unless it materially affected
the merits of the action. R. S. 1899, sec. 865; McFar-
land v. Heim, 127 Mo. 327; Burns v. City, 131 Mo. 378.

VALLIANT, J.—Defendant corporation at the
times hereinafter mentioned was engaged in the busi-
ness of manufacturing candy in the city of St. Joseph;
the plaintiff was an employee in its service. Defend-
ant's factory was destroyed by fire on December 23,
1902; at the time the fire occurred the plaintiff and sev-
eral other young women employees were in a room on
the third floor of the building, and to escape death from
the flames they jumped out of a window, which was
thirty or thirty-five feet from the ground. The plain-
tiff by the fall sustained very severe injuries. She
brings this suit to recover damages for her injuries, al-
leging that they were the result of the negligence of
the defendant her employer; she recovered a judgment
for $5,000, and the defendant appealed.

The buildings in which defendant conducted its
business fronted east on Second street, and extended
back west about 140 feet to an alley. There were three
buildings in the group, which are referred to in the

record as the north, the middle and the south building. The north building was separated from the one in the middle by a solid partition brick wall; we have nothing to do with that building, it is only to the middle and south buildings that our attention is directed. The employees entered the factory by the front door in the south building. There were usually 150 or more employees, the most of whom were girls from fifteen to nineteen years of age, about forty of whom usually worked on the second and third floors.

The petition is quite lengthy; it is descriptive of the buildings, their contents and the mode of conducting the business; it charges negligence in several particulars, the combustible character of the internal partitions, the lack of sufficient exits, doors, stairways, fire escapes, etc., the condition of the electric lights, the boiler, furnaces, kettles, pipes, gas-jets, electric wires, electric lamps, lack of sufficient watching to discover the fire, lack of care to discover it and to give alarm, etc. In appellant's printed abstract it is said that the defendant filed a motion to strike out parts of the amended petition, which was overruled and exception taken and preserved in a term bill of exceptions, and what purports to be a copy of that motion is set out in the abstract, but no such term bill of exceptions is in this record, and that motion is not in the bill of exceptions now before us. It is also said that there was a motion to make the amended petition more definite and certain, which was also overruled, and what purports to be a copy of that motion is set out in the abstract, but it does not appear in the bill of exceptions. And the same is true of an alleged motion to require the plaintiff to elect upon which of, so-called, two causes of action she will stand. After the motions were overruled defendant answered by general denial and a plea of contributory negligence; there is also in the answer what appellant calls a plea of assumption of risk.

The evidence in the case is very voluminous; it was

necessarily so, because for an intelligent understanding of the case a full description of the buildings, of their contents and of the mode of conducting the business was necessary. It is sufficient, however, for our present purpose to say that the evidence on the part of the plaintiff very clearly shows that the defendant was engaged in a business very hazardous on account of its liability to fire. From the basement to the third story the conditions were full of danger of fire. Whilst the partition wall between the south and the middle buildings was of brick, with a door through which to pass from one to the other on each floor, yet the inner partition walls making separate rooms for the various divisions of the work were of wood; the shelves and scaffoldings that lined the walls were of wood; the materials used in the making of candy, of which there was a large quantity on each floor, were of highly combustible character; the material used in packing was equally so, paper, paper boxes, excelsior packing, etc., the furnaces, gas jets for heating, the kettles, the steam pipes, etc., all combined to make an establishment peculiarly liable to destruction by fire. And, as if facilitating a quick communication of fire from one floor to another, there were freight elevator wells and what was called a dummy elevator or dumb-waiter. One of the elevator wells and this dumb-waiter were in the middle building, and it was through the dumb-waiter that the blaze and smoke came up to the third floor, and cut off the escape of the plaintiff and those with her. This dumb-waiter came up very near the only door in the brick partition wall through which they could escape from the middle building, where the fire then was, into the south building. Just east of the dumb-waiter was a stairway leading to the second floor. Down this stairway one of the girls, the one to first discover the fire, made her escape, but the fire gained so rapidly that it cut off the escape of the others.

There was on each floor and in the basement a large

quantity of highly inflammable material.   There were
boilers in the basement heated by gas jets; these were
within a few feet of the basement end of the dumb ele-
vator.   It was the custom to light these gas jets about
five o'clock in the morning and the night-watchman tes-
tified that he did so on this morning.   On the second
floor there were four furnaces heated with coke; they
were two feet wide and three feet high.

In the rear or west end of the third floor in the
middle building were two rooms of wooden walls used
by the female employees for dressing rooms.   In these
the young women changed their clothes, putting on
their working clothes before going to work and taking
them off when the work of the day was ended.   These
rooms were not used for any other purpose.   There was
a fire escape on the outside at the front or east end of
the buildings, but none at the rear end where those
dressing rooms were, except that there was an iron lad-
der on the outside west end of the south building ex-
tending from the top of the building down to the sec-
ond floor, terminating over an areaway in which there
were stone steps leading from the ground into the cel-
lar; that ladder was not accessible to the girls in the
dressing room.

At 6:45 o'clock in the morning of December 23,
1902, the plaintiff and several other young women em-
ployees came to the factory, entered the front door in
the south building, passed up the stairway in that build-
ing to the second floor, crossed over through the door
in the partition wall into the middle building, thence up'
the stairway in that building to the third floor and back
to the dressing rooms to get ready for the work which
was to begin at 7 o'clock.   At the time they thus went
up the stairways and into the dressing rooms they ob-
served no indication of fire.   One of the girls, Miss
Gleich, who had arrived earlier than the plaintiff, was
first ready to leave the dressing rooms; when she
opened the door she discovered smoke and called out to

the others that there was fire and as she ran out she caught one by the hand and tried to pull her along, but the girl was frightened when they got out and ran back into the dressing room; flame and smoke were then coming out of the opening in the dumb waiter; Miss Gleich ran on aiming to get to the fire escape in the front part of the building, but in the excitement she made a misstep and fell down the stairway; it was a fortunate misstep for her, because as it resulted she was not hurt and in that way made her escape into the south building. After she had reached the second floor of the middle building and had passed into the south building and was coming down the stairway to the first floor, she met Mr. Lewis, the assistant superintendent or foreman, who asked her if their were any girls in the dressing rooms; she answered yes, and he and another employee, Mr. Kiddoo, started up to their rescue, but when they got to the second floor the smoke coming through the door from the middle building was so dense they could not proceed; they tried to reach the girls in another direction, but were cut off by the smoke and flames. The girls got out of the windows and hung on by their hands to the window sills until their strength was exhausted and they fell to the ground. The plaintiff's injuries were of a very serious character. The fire was first discovered at 6:50 o'clock, which was just five minutes after the plaintiff and the girls with her had gone up the stairways to the dressing room. The fire was first discovered by a young man, an employee named Rasmussen, who was in the rear part of the first floor of the south building when he saw the smoke coming through the floor from the middle building; he immediately ran to the front holloing "fire," and ran out to the fire department office which was very near in the rear to give the alarm, but when he got there one of the firemen had already heard the girls screaming and had turned in the alarm; the fireman testified that he noted the time when he turned in the alarm, it was

just 6:50, and at that moment one of the girls fell from the window.

Enoch Kellar was the nightwatchman in the building and had been on duty the night before the fire; he testified that he had made the regular rounds during the night, the last being after five o'clock that morning, had lighted the gas jets under the chocolate pans in the basement about five o'clock, and left the building about 6:30 or 6:35; he saw no indication of fire when he left.

There were all over the buildings a great many pendent electric lights, swinging from the ceiling or upper floors. A good deal of evidence was directed to one of these lights. It hung down in the room on the first floor of the middle building within about six feet of the floor; it was called by some of the employees the "crazy lamp." There was no plastering over-head, the flooring joists were exposed, and between them at intervals were braces nailed. There was what the witnesses called a scaffolding, which was in fact a set of swinging shelves or bins suspending from the flooring joists and extending down to within six or eight feet of the floor. These shelves or bins were used for storing paper boxes, wax paper, trimmings, etc.; the south side of the scaffold was "right up against this dummy elevator." When the employees had to use one of these pending electric lights in connection with this scaffold they had to pass the globe or bulb over and draw its cord along the braces between the over-head floor joists to bring it where it would cast its light into the particular shelf or bin desired. The light in question, which the witness called the crazy light, was one of these. The key of this lamp by which the light was to be turned on or off would not perform its office and the only way the light could be turned off when on was to remove the globe or bulb, and on when off was to replace the globe. The employees had been using it in this way for a considerable time, and two weeks before the fire one of the employees in so using it had received

a shock from it, and called the attention of the woman who had charge of the other employees in the room to the condition of the lamp, and also notified Mr. Ward, who had supervision of that with other matters. Mr. Ward attempted to fix it, but it worked no better after his attempt than before.

About 10 o'clock in the evening before the fire one of the female employees, desiring to get some paper boxes off the scaffold, passed this electric lamp over the braces in the overhead joists and drew the cord along them until the lamp hung down two or three feet from the joists and within sixteen or eighteen inches of the scaffold. When she quit work she took off the globe to extinguish the light and left the apparatus in that condition.

Plaintiff's expert testimony tended to show that the handling of the lamp and its cord in the manner in which this was handled was liable to loosen the screws in the socket, disarrange its arrangement, and to wear out the insulation on the cord. How soon it would wear out, would depend on the character of the handling. The usual insulation is cotton or silk, it depends on the temperature in the building how soon the insulation will harden and break; the heat or steam or wet will make it rot quicker than if it was in an entirely dry room.

No witness who examined the lamp was an expert. Mr. Ward, who was an employee of defendant and one of its witnesses, testified that he was a mechanic, had general supervision of all the machinery and appliances in the establishment, including the lighting apparatus and appliances, but that he was not an electrician and knew nothing about electrical appliances except as he observed when experts in that line were putting in or repairing such in that establishment; that his duty was to observe when anything was out of order and repair it if he could, or employ some one to do it if he could not. He sometimes put in fuses when they

burned out, but had never put in a fuse on that floor. Sometimes when sockets were worn out he would take out the old ones and put in new ones; if a wire got loose from the connecting screw, as it sometimes did in the using, he would open the socket and connect the wire and put it back; these were porcelain sockets.

The testimony of the defendant tended to show that there were fuses wherever they were needed, and that the office of the fuse was to absorb the heat when a short circuit was formed and cut off the electric current; that these fuses were placed, first at the point where the wires entered the house, next at the point of distribution to the various parts of the building, and again at what a witness called the rosette. When a short circuit would occur in a single pendent, the heat would first attack the fuse in the rosette, and if that did not extinguish the current it would go to the fuse at the point of distribution, and if that failed then to the point of entrance to the building. In the opinion of these experts, if the electric plant in the building was properly fused, and if the fuses were all in proper working order a fire could not be communicated to the building by a short circuit in the socket. Defendant's testimony tended also to show that in the year before the fire the electric lighting system in the buildings had been overhauled and repaired and put in good condition. In March, 1902, the city electrician made an official inspection of the system, and found it in good condition; he testified that he did not consider that it would need another inspection for four or five years. The defendant's expert witnesses testified that, in their opinion, the mere fact that the key was out of fix so that it would not turn the light on or off would not create a short circuit.

At the close of the plaintiff's case and again at the close of all the evidence the defendant asked instructions in the nature of demurrers to the evidence which were overruled and exceptions taken.

The instructions given at the request of the plaintiff authorized a verdict in her favor if the jury should find that the fire was caused by the defective lamp and that defendant had not exercised reasonable care to have it repaired or in allowing it to be used in its defective condition, or if the jury should find that the defendant had not exercised reasonable care to provide means of escape in case of fire, and that the plaintiff's injuries were the result of such negligence. The instructions on those two points are too long to copy here and it is unnecessary to do so, because the propositions of law contained in them are as above indicated. As those are the propositions chiefly discussed in the briefs we will first consider them, separately.

I. Defendant insists that there was no evidence on which to base the hypothesis that the defective lamp caused the fire; it insists that the only defect shown in the lamp was that the key would not perform its office and that the undisputed evidence was that that defect would not create a short circuit; that the burden was on the plaintiff to prove the origin of the fire if she relied on the fact that it occurred through defendant's negligence. It is true the burden of proof is on the plaintiff and that burden is not removed by testimony which leaves the origin of the fire to mere conjecture, but it is also true that in such case the plaintiff is not required to prove the fact by the positive evidence of a witness who saw the first spark and what it kindled; it is sufficient if she shows a condition of affairs, a combination of circumstances, from which reasonable and fair-minded men are justified in drawing the conclusion that the fire did occur as she charges it did.

We are now dealing with a subject which, though scientific in character, has come into such common use that men whose daily experience has brought them into contact with it are justified in forming opinions of their own based on well-known natural laws. In such case the opinions of experts are instructive and valuable

aids, but not necessarily conclusive on the minds of the triers of the fact, if their own common sense experience deems the opinions unreasonable.

For example, in the brief of appellant it is said: "Plaintiff's witness Cain testified that if this globe had been removed, it was not possible for this lamp to have caused the fire." The learned counsel seem to have understood the witness to mean that when the globe is removed it is impossible for a short circuit to be formed in the socket which held the lamp. We think the counsel misunderstood the meaning of what the witness said, but even if the witness had given that as his opinion the jury would have been justified in disregarding it, because it is contrary to the well-known natural law. What the witness said was this: "When you take the bulb out, it stops the current. The current cannot pass through after the bulb or globe is removed, even if the key is out of condition." When the appliance is in normal condition the wires in the cord are insulated and separated, they become connected by means of the conductor in the bulb attachment so as to receive the current and then the electricity passes into the lamp, but when you remove the bulb the connection that was formed by it is broken and if there is no other connection, accidental or otherwise, there is no current in the wires. That is what the witness meant. He never intended to say that after the globe or bulb was removed the current could not be brought on by bringing the ends of the wires together or by uniting them in touch with a common conductor, and if he had said so his opinion would have been of no value.

The defendant's expert witnesses said that the mere failure of the key in this lamp to do what it was designed to do would not create a short circuit and in that respect they were correct; the common sense of an intelligent jury with daily experience with such lamps would readily understand that. In the cord which conducts the electric current to the lamp are two very small

wires insulated by being wrapped with rubber, and cotton or silk; as long as they are kept apart the electric current will not pass, but the moment the ends of the wires are brought together or united by both touching a common conductor the current is put into action and its energy is shown in the light produced when it touches the carbon filament in the vacuum in the incandescent lamp, but when the lamp is not there to perform its part, if the ends of the wires should by accident be united, the current returns, creating what is called a short circuit. The ends of these wires are contained in what the witnesses called a socket; the globe or bulb or lamp, containing the light-giving carbon, contains also at the end which is to be inserted in the socket a metallic conductor which touches the positive and negative poles of the wires and carries the current into the lamp. The key in question is designed to operate a non-conductor inside the socket, which when applied separates the poles and cuts off the current, but when turned the other way restores the current. Ordinarily this non-conductor consists of an air space which is effected by the turning of the key. Therefore, when the lamp is attached, if the key does not operate to apply the non-conductor, the current is not broken, but passes into the lamp, so that what the witnesses said was true, when the lamp is inserted in the socket and there is no key to hold the poles apart the current comes on and when the lamp is removed the current is broken —that is, provided everything is in working order. The removal of the lamp leaves the poles as completely disconnected as the interposition of the non-conductor by the key would have done.

But whilst the failure of the key to do its part would not, of itself, create a short circuit, yet the fact that it would not do its part rendered it necessary to subject the lamp and the socket to a handling for which they were not designed. The screws that hold the wires in place in the socket sometimes get loose from hand-

ling and usage, as defendant's witness Ward said, and this liability of course would increase by the unusual handling and the use which was the result of the habitual taking of the lamp off and putting it on by employees unskilled in such matters. One of those small metallic screws dropping out of its place and held loose in the socket is very liable to come in contact with the two ends of the wires in the socket and, being a good conductor, would produce a short circuit.

But there was a use to which this lamp was subjected which, independent of the defective key, might very reasonably have been expected to result in a short circuit. The wires in the cord were wrapped with soft insulating substance to keep them apart. The common custom when any employee had occasion to use the lamp was to pass it over and draw the cord along the braces in the flooring joists overhead to the point where the light was needed. The jury needed no expert testimony to tell them that that practice was liable to wear away the insulation and allow the wires to touch each other and the fact is that when or whenever they should happen to touch the short circuit would be made. It was an old building and those floor joists and their braces may have been as combustible as tinder and if the jury came to the conclusion, considering all the circumstances, that the fire originated from the hot wires of that lamp on those well-seasoned timbers we cannot say that they had no reasonable grounds on which to base their conclusion. True there was no direct evidence that the insulation was worn or rubbed off the wires or that the floor joists and their braces were well seasoned, but there was evidence to show a frequent and continued usage of the cord that would produce that result and evidence that the building was old, and from those facts a fair inference may be drawn.

The fact that the key would not work, and that the only way in which the lamp could be used was by taking

the globe off and putting it on when the purpose was to turn off or turn on the light and the consequent manipulation of the socket was brought to the notice of Mr. Ward who made an unsuccessful effort to fix it two weeks before the fire. Mr. Ward was not an electrician, but he was the only man the defendant had placed in charge of that work, and his knowledge was the defendant's knowledge; if he was not competent to appreciate the danger to be apprehended from the abnormal use of the lamp which the absence of the key required, it was the defendant's fault for putting an incompetent man in that position.

The fact that this lamp was being used by passing it over the braces and drawing its cord along the same by the young women in that part of the building was a custom that had existed long enough for the inference to be drawn that the defendant knew or ought to have known it.

But defendant argues that the evidence shows that the lighting apparatus in the factory was properly provided with fuses and that with proper fuses a short circuit could result only in blowing out a fuse and cutting off the electric current, rendering the wires absolutely harmless. It is true the experts did express those opinions and may be the scientific theory on which the opinions were based is correct, but against those opinions we have the fact that the fire did occur and the only cause to which it has been reasonably attributed is the short circuit in the attachment of the lamp in question; the defendant has been content to say that the fire could not have occurred in that way but has offered no suggestion of any other cause. Of course the burden was not on the defendant to show how the fire did occur, but after the plaintiff had advanced a reasonable theory, showing how the conditions existing were liable to produce a fire, that theory is strengthened by the absence of a suggestion of any other theory drawn from the circumstances. But after all the expert testimony

amounts to this only: if the system was properly fused in the beginning or when last examined by the city inspector, if the fuses were just the ampere capacity required, if there was no defect in them, visible or invisible, if nothing had occurred to put any one of them out of order, then, if a short circuit should occur, the fuse would have protected the cord and have prevented the fire. There are too many contingencies in that hypothesis to justify the court in taking the case from the jury on the theory that a short circuit could not have been the origin of this fire. The defendant was entitled to have a jury consider those conditions, but they made a question for the jury, not for the court.

Mr. Ward testified that a fuse would sometimes get out of fix and that when he discovered it he would put in a new one, he bought the material and did the work. Whether—even taking his own account of himself—he was competent to do this work was a serious question. The use of electricity has become indispensable to man, but it is the most dangerous natural agency man can employ, and when its use may imperil the lives of his servants the master cannot be' too careful. The law requires him to exercise reasonable care in its use to protect his servants from injury; whether the care exercised in a given case is reasonable or not depends on the circumstances of the case, the greater the danger to be expected the greater the care to be observed. Here was a building filled with highly combustible material in which were employed about 150 servants, chiefly young women, working among kettles and furnaces on the upper floor, those were facts to draw the master's attention and gauge the care he ought to exercise, and they are facts to be taken into account by the jury when they are determining whether or not the master exercised the degree of care that a reasonably prudent person under like circumstances would be expected to exercise.

The court did not err in submitting to the jury the

question of negligence of the defendant in regard to the origin of the fire.

II. The second instruction authorized a verdict for the plaintiff if the defendant was negligent in respect of the means of escape provided and if that negligence was the cause of the injuries. This instruction covers the whole establishment and includes doors, windows, stairways and outside fire escapes.

The evidence shows that at 6:45 when the girls went upstairs into this dressing room there was no evidence of fire that attracted any one's notice, and yet in five minutes the smoke and flame were coming with such volume through the dumb-waiter as to cut off their escape by the stairway and the outside fire escape on the other end of the building, and to drive Lewis and Kiddoo back when they attempted to go to the rescue. That shows with greater force than detail description the character of the building and its contents as liable to destruction by fire. Defendant had been in this business at this place fifteen years, long enough to have known the conditions existing, and should have known the necessity of exercising reasonable care to guard against an accident of this kind, and defendant says that it did in fact do all that a reasonably prudent master in like situation could be expected to have done to protect his servants from this danger. If that is true, then defendant was not guilty of negligence in that respect, but, taking into consideration the circumstances existing, the question of whether or not defendant was guilty was one for the jury and not for the court.

The defendant contends that the common law did not require it to provide fire escapes, and that it had complied with the requirement of the statute in that respect; therefore, it was not negligent. The common law rule is thus stated in 13 Am. and Eng. Ency. Law (2 Ed.), 82:

"At common law the owner of a building not peculiarly exposed to the danger of fire from the **character**

of the work to be carried on in it was not bound to anticipate the possibility of remote danger from fire or that its occurrence would put in jeopardy the lives of his employees or tenants, and the law did not require, where the building was properly constructed for its intended use and purpose, the construction of fire escapes, the ordinary means of escape by stairs, halls, doorways, and windows being deemed sufficient."

In other words, the common law applied to the situation the general rule of conduct to be observed by the master in caring for the safety of his servants, that is, reasonable care commensurate with the danger reasonably to be apprehended. Whatever such reasonable care would suggest as the duty of one in the situation of this master, whether it be the furnishing of one well-known device or another, the common law required in this case.

The statute requirement is in section 10078, Revised Statutes 1899: "Such rooms or places shall also have a sufficient number of doors, stairways and fire-escapes for the ready egress and escape of the maximum number of employees therein," etc. The act of 1901 in section 1 requires . the proprietor of the establishment "to provide said structure with fire-escapes attached to the exterior of the building and by stair cases, located in the interior of the building." And in section 3 it requires that such buildings "shall have at least one fire-escape for every twenty to fifty persons for whom working, sleeping or living accommodations are provided above the second story." The act also prescribes the kind of fire-escapes to be used. [Laws 1901, p. 219.] These statutes do not relieve the master in any degree from his common law liability to exercise ordinary care to provide means of escape for his servants in case of fire. They prescribe the minimum of what he shall do in that respect to avoid the penalty of the statute, but they do not say that when he has placed one fire escape of the prescribed character on his building he owes his

employees no further duty to guard their lives from that danger. The act of 1901 says he shall furnish "fire escapes," and section 10078 says he shall furnish a sufficient number of them. And whilst the statute makes it the duty of the labor commissioner to inspect the factory to see that the law is complied with, yet the approval of the labor commissioner of the appliances furnished does not discharge the master if in fact he has not done his duty.

The facts of this case are, there was but one stairway leading down from the third story where this dressing room was, but one doorway for passage into the south building; this stairway and this doorway were close to the dumb-waiter through which the flames and smoke were coming, and there was but one fire escape on the outside, and to reach it these girls would have to pass through the flames and smoke and through a very narrow passage between shelves or bins containing wax paper and other such material, west of the doorway which was beside the dumb-waiter; there was no escape except by jumping out of the windows as these girls did. Under those conditions can it be said that the defendant exercised that degree of care to provide means for escape of these young women that a man of ordinary prudence appreciating the responsibility would be expected to exercise under like circumstances? If it can be so said a jury must say it. There was no error in submitting that question to the jury.

III. There was an instruction given at the request of plaintiff to the effect that if Mr. Ward, who was the machinist who had charge and supervision of all the machinery and the lighting apparatus with authority to make repairs or have them made when needed, was informed of the condition of this alleged defective light and neglected to repair it or have it repaired, his neglect was the neglect of the defendant; and that if Mrs. Challis, who was a sort of foreman, having charge of the young women working on the floor where the alleged

defective light was, knew of the condition and neglected to have it repaired, her negligence was the negligence of the master. That instruction was wrong in so far as it imputed negligence to the master on account of the failure of Mrs. Challis to have the lamp repaired; the mere fact that she had supervision and direction of the young women in their work gave her no duty in reference to the lighting apparatus. But the error in that instruction in that particular would not justify a reversal of the case because the defendant's own evidence showed that Mr. Ward who was the master's *alter ego* in that particular knew the condition of the lamp two weeks before the fire and if he was negligent in failing to repair it, it was the master's negligence.

There was also an instruction to the effect that if the watchman who was on duty the night before and who left the building about 6:30 or 6:35 that morning failed to exercise reasonable care to discover the fire before he left and give the alarm, his negligence in that respect was the negligence of the defendant, and another one to the effect that if Mr. Lewis discovered the fire, or by the exercise of ordinary care would have discovered it in time to have warned the plaintiff, and failed to do so, his negligence was chargeable to the defendant. Neither of those instructions in terms authorized the jury to render a verdict for the plaintiff because of such negligence, and for this reason the plaintiff says the instructions if erroneous were but abstract propositions of law and harmless. We do not agree to that proposition. In a suit in which the plaintiff predicates her right to recover on the ground of defendant's negligence it is error to instruct the jury that certain facts amount to negligence on the part of the defendant unless the negligence mentioned is negligence for which the defendant is liable in that case.

Under all the circumstances in evidence in this case it would perhaps not be unreasonable to infer that the fire had started to burn before the watchman went

off duty, and that if he had been in the due observance of his duty he would have discovered it in time to have given the alarm before the young women went up to the dressing room, and if he was negligent in that respect his negligence was imputable to the master.

But there was no evidence tending to show that Mr. Lewis was negligent either in not discovering the fire in time or in failing to give notice to the plaintiff after he did discover it; therefore, the instruction presenting the question of his negligence to the jury should not have been given.    True the instruction does not direct the jury to find a verdict for the plaintiff if they should conclude that Mr. Lewis was negligent in the particulars mentioned, but the jury were liable to conclude that the court meant by that instruction that there was evidence that Mr. Lewis was negligent and that if he was negligent the defendant should pay for it.    We cannot say that that was a harmless error.

IV.    Since the cause will have to be re-tried because of the error in the instruction last mentioned we deem it proper to notice some of the instructions given at the request of the defendant.

In the second instruction for the defendant the jury, after being admonished that they must be guided by the instructions and evidence, and that defendant is not liable for mere accident or mischance, are told that the defendant is not liable ''on account of fire'' unless it is proven that the fire was caused by the actual negligence of the defendant.    By this we presume the court intended to say that the defendant was not liable on account of the origin of the fire unless it was proven that it was caused by defendant's negligence, and in that light it is correct; but there were two questions of negligence submitted to the jury, one related to the origin of the fire the other to a lack of sufficient fire escapes.

This instruction would be less liable to misinterpretation if instead of saying ''on account of fire'' it

had said "on account of the origin of the fire." · The instruction continuing says: "And such evidence in proof of negligence should be based upon and be a reasonable, logical and necessary conclusion from the facts and circumstances shown by the evidence," etc. The sentence is a little awkward in its construction, saying in effect that the evidence in proof of negligence should be based on a conclusion drawn from the evidence, but we would not stop to criticise it on that account if it did not carry also the idea that the conclusion of negligence to be drawn from the circumstances in evidence must not only be the reasonable and logical conclusion but that it must also be the "necessary" conclusion; that means beyond the possibility of doubt. The law does not require in ordinary civil suits that a conclusion from circumstances must be irresistible, it is sufficient if it is the most reasonable and logical conclusion that can be fairly drawn from the circumstances.

Instruction 4 for defendant was to the effect that if the fire had made such progress, when the plaintiff and her companions on coming out of the dressing room discovered it, that the flame and smoke cut off their escape through the stairway, the door and the fire escape on the east end of the building, and that their only retreat from death by fire was to return to the dressing room and jump out of the windows as they did "then the court instructs the jury that plaintiff can recover only on the ground that the fire was started by defendant's negligence." That was equivalent to saying to the jury that the one fire escape on the front end of the building was sufficient, and that if the smoke and flame rendered it impossible for the plaintiff to reach that fire escape she could not recover, although the jury might have been satisfied from the evidence that the one fire escape provided was not all that could have been expected of a reasonably prudent master under the peculiar circumstances of this case. Considering the inflammable character of the materials with

which these buildings were filled from cellar to garret, it was beyond the province of the court to say as a matter of law that the one fire escape at the front end of the building was sufficient. That instruction was erroneous.

Defendant's 7th instruction given was to the effect that the master had the right to arrange his buildings, partitions, rooms, subdivisions, doors, stairways, elevators, fire escapes, etc., to suit himself and to place his materials and operate his business as he saw fit, and a servant accepting and continuing in employment in full view of the arrangements and the plan of conducting the business "assumes all perils incident to the employment in which he is engaged arising from" such conditions and *modus operandi,* and is not entitled to recover for injuries attributable to the risk so assumed.

This instruction is drawn on the theory set out in what defendant calls a plea of assumption of risk. That is not a good plea. In a case like this, where the servant sues the master for injuries received in consequence of what the servant alleges was the master's negligence, the master under a general denial may prove, if he can, any fact going to show that the servant's injuries were not caused by the master's negligence; for example, he may show that the accident was one of the perils incident to the business, and one which was liable to happen notwithstanding the master had not been negligent in any respect.

The servant by entering into the employment assumes the risk of those accidents which are liable to occur as incident to the character of the business when that business is conducted by the master with that degree of care to avoid injury to his servant which a master of ordinary prudence and common sense under like circumstances would observe; and if the master, when sued, in a case like this, wants to introduce evidence to show that the accident was one of those incident to the business, when conducted as above stated, he may do

so under the general denial, because such proof only goes to show that the accident was not the result of his negligence.

But the negligence of the master, is not one of the perils incident to the business which the servant assumes.  If the peril of the servant in the performance of his duty is increased by the negligence of the master and if the servant, knowing that the master has been thus negligent and that that negligence has rendered the performance of his duty more hazardous, continues in the performance of that duty, a question of contributory negligence then arises, not a question of assumption of risk.  Language is sometimes used by textwriters and in some judicial opinions which seems to indicate that under the circumstances just mentioned there is an assumption of risk by the servant, but such language is not carefully chosen or, if it is intended literally as expressed, it does not state the rule of law as declared by this court; it is not the law in Missouri.

Treating it as a question of contributory negligence the rule of law is that if the danger arising from the master's negligent act is so obvious that the servant, considering his capacity and opportunity, must have known and realized its degree, the court would declare his act of so continuing in his work contributory negligence as a matter of law, but if the peril was not so obvious, if the danger was such as to make it a question whether or not the servant, considering his capacity and opportunity of judging, might reasonably expect that he could continue the service by exercising ordinary care, then it is a question for the jury. [Blanton v. Dold, 109 Mo. 64, l. c. 75-6; Settle v. Railroad, 127 Mo. 336, l. c. 342; Pauck v. Beef Co., 159 Mo. 467, l. c. 477; Wendler v. People's House Fur. Co., 165 Mo. 527; Curtis v. McNair, 173 Mo. 270, l. c. 280; Parks v. Railroad, 178 Mo. 108, l. c. 118-19-20; Cole v. Railroad, 183 Mo. 81, l. c. 94.]

This instruction directs a verdict for the defend-

ant if the plaintiff was aware of the plan of the buildings, its compartments, the manner of conducting the business, etc., regardless of plaintiff's capacity to know or appreciate the danger and regardless of the question of whether or not she might have reasonably thought that under the conditions as they appeared to her she could proceed with the work with reasonable expectation of safety, using ordinary care.    That instruction was erroneous.

Defendant's instruction numbered 10 should not have been given.  It was to the effect that if the defendant had a fire escape on the east end of its buildings which had been inspected and approved by the state factory inspector the law did not require defendant to have a fire escape on the other end of the buildings connected with the dressing room "provided the jury believe from the evidence that said fire escape at the east end of said buildings was reasonably sufficient as a means of egress from said buildings and factory under the circumstances shown in the evidence."    There was no dispute that that fire escape was in and of itself a sufficient means of egress for a person who could get to it, but because it was in and of itself a suitable contrivance and would have afforded the plaintiff and her companions a safe means of escape if they had happened to be in that end of the buildings, it does not necessarily follow that the defendant had in that respect done all that could be expected of a reasonably prudent master to provide means of escape for his servants who in the regular course of the business were liable to be in parts of the buildings where they would be cut off from the fire escape in front.    If by the concluding words above quoted, "under the circumstances shown in evidence," the writer of the instruction meant to say the master had discharged his full duty in this particular provided the jury should believe that the fire escape at the front end of the buildings was "reasonably sufficient as a means of egress" for these girls

"under the circumstances shown in evidence," that is, in the dressing room at the west end of the third floor, then the instruction was erroneous because there was no evidence to support it.   All the evidence was that when they discovered the fire the smoke and flames were such that the fire escape on the front end was beyond their reach.

Under instruction 12 the jury were directed to find for the defendant if they should "believe from the evidence that the plaintiff, taking into consideration the circumstances and situation in which she was placed at the time she discovered the fire, could have safely escaped from said building, thereby preventing the injury for which she has sued."   There was no evidence on which to base that instruction.   Plaintiff's evidence shows that when she discovered the fire her choice of ways lay between running through smoke and flame towards the stairway down which Miss Gleich escaped by chance, or jumping out of the west window, and the evidence of Mr. Lewis for defendant was that as soon as he discovered the fire he ran to the rescue but was driven back by the smoke.

The court gave thirteen instructions asked by the defendant and refused thirty-one.   There was no necessity for such a multitude of instructions, and if the court had refused them all on the ground that they were too voluminous we would have sustained the ruling. Instructions should enlighten the jury as to the issues they are to try and the law bearing on those issues. Instructions overwhelming in multitude tend rather to bewilder than to enlighten.

The general plan of these refused instructions was to take the buildings and their contents in detail, specifying each feature, and declare that the maintaining of that feature was not negligence, the liable effect of which was to withdraw the attention of the jury from the establishment as a whole.   Without discussing in detail these refused instructions we deem it sufficient

to say that the instructions given for the defendant presented the case at least as favorable to the defense as the evidence warranted.

V.   Over the objection of defendant the plaintiff introduced expert evidence from a fire insurance standpoint tending to show that fire insurance men classed buildings as non-hazardous, hazardous, extra hazardous and especially hazardous, and that candy factories came within the last-named class, which was considered as the most hazardous of all insurance risks.

That evidence was incompetent for   this   reason: When the condition of those buildings and their contents and the character of the contents in respect of their liability to fire, and the ignitible materials in use, were all shown in evidence, a jury of ordinary common sense could judge as well as an expert fire insurance agent of the liability of the establishment to conflagration or deflagration.   Expert testimony was competent to prove the degree of inflammability of those materials in use which did not come within the common experience of men, such as some of the ingredients that went into the manufactured article, but when that is in evidence and the common materials, a jury has no use for expert testimony to enlighten them on the degree of the liability of the establishment, as a whole, to destruction when a fire is once fairly started.   Under the circumstances of this case we cannot think that this evidence was of any serious consequence and would not reverse the judgment on that account only, but as the case is to be retried we refer to it as an error to be avoided.

VI.   As to the alleged errors in overruling the motions to strike out, to make more definite and to elect, they are not properly before us for review, and if they had been properly preserved the exceptions would have been waived by subsequent pleading to the merits and going to trial.   The petition states a cause of action, and therefore after answer to the merits and trial it

is too late to consider any objection less serious than a failure to state facts constituting a cause of action or want of jurisdiction. [Fuggle v. Hobbs, 42 Mo. 537, l. c. 541; Scovill v. Glasner, 79 Mo. 449, l. c. 454; Sauter v. Leveridge, 103 Mo. 615; State ex rel. v. Bank, 160 Mo. 640, l. c. 646.]

The only reversible error we find in the record is that contained in plaintiff's instruction No. 6 relating to the supposed negligence of Mr. Lewis in failing to give plaintiff timely warning; for that error the judgment will be reversed and the cause remanded to the circuit court to be tried according to the law as herein expressed. All concur, except *Graves, J.,* not sitting.