## L. F. MEYERS, Respondent, v. O'BEAR-NESTOR GLASS COMPANY, Appellant.

Kansas City Court of Appeals, February 17, 1908.

1. **MASTER AND SERVANT: Contributory Negligence: Defective Wagon: Demurrer to the Evidence.**   On a review of the evidence a teamster of forty years' experience who used a wagon knowing that its double-trees were so insecurely fastened as to be dangerous and in such negligent manner as to add to the hazard, is held guilty of contributory negligence though he complained of the defect and its repair had been promised.

2. ————: ————: **State of Mind: Evidence.** If a certain state
of mind, as whether a servant thought he could use a given
defective implement with safety, is in issue to allow a case to
pass off on the mere *ipse dixit* of such servant that his mind
was thus or so would be to allow him to decide the case for him-
self, and the court or jury would have nothing to do but to enter
the verdict.

Appeal from Jackson Circuit Court.—*Hon. James E.
Goodrich,* Judge.

REVERSED.

*Warner, Dean, McLeod & Timmonds* for appellant.

(1) The law does not impose upon the master the
obligation to furnish a good and sufficient appliance.
He is not an insurer of the safety of the appliance he
furnishes. He is only bound to use ordinary care in
furnishing reasonably safe appliances. Goins v. Rail-
road, 37 Mo. App. 221; Harrington v. Railroad, 104
Mo. App. 663; Grattis v. Railroad, 153 Mo. 403; Blan-
ton v. Dold, 109 Mo. 64; Covey v. Railroad, 86 Mo.
635. And the petition having charged a higher duty
upon defendant than the law imposes, it is fatally de-
fective. Canter v. Mining Co., 35 Fed. 41. (2) Plain-
tiff's own testimony shows that he assumed the risks,
and that he was guilty of contributory negligence.
Hicks v. Railroad, 46 Mo. App. 304; Marshall v. Press
Co., 69 Mo. App. 256; Harrington v. Railroad, 104 Mo.
App. 663; Pohlman v. Car Co., 100 S. W. 544; Cox v.
Granite Company, 39 Mo. App. 424; Porter v. Railroad,
71 Mo. 66; Bohn v. Railroad, 106 Mo. 429; Glover v.
Bolt Co., 153 Mo. 327; 189 Mo. 552, 562; 195 Mo. 664;
197 Mo. 267.

*Ralph S. Latshaw* for respondent.

(1) Chenoweth v. Sutherland, 101 S. W. 1105.
(2) Appliances such "as are usually and ordi-
narily furnished by ordinarily and reasonably prudent
and careful persons engaged in similar work" is not an

objectionable criterion of the master's obligation to the servant.    Morton v. D. G. Co., 103 S. W. 591; Brunke v. Telegraph Co., 115 Mo. App. 36; White v. Railroad, 84 Mo. App. 411; Hunt v. Lead Co., 104 Mo. App. 377; Kane v. Faulk Co., 93 Mo. App. 209; O'Meilla v. Railroad, 115 Mo. 205; Henry v. Railroad, 66 Ia. 52; Maynard v. Buck, 100 Mass. 40; Reed v. Railroad, 94 Mo. App. 371; Spencer v. Bruner, 103 S. W. 578; Garaci v. Hill-O'Meara Const. Co., 104 S. W. 595; Schaefer v. Railway, 128 Mo. 64, 30 S. W. 331; Taylor v. Iron Co., 133 Mo. 349; 34 S. W. 581; Chenoweth v. Sutherland, 101 S. W. 1108.

ELLISON, J.—Plaintiff was in the employment of defendant as a teamster. He was injured while in that employment. He claims the injury was caused by defendant's negligence and brought this action in which he recovered judgment in the trial court.

Since the verdict was for the plaintiff, we will regard all the substantial evidence in his behalf as established in fact, and dispose of the case on that basis. He testified that he was sixty-two years of age and had been a teamster for forty years. At the time of his injury he was hauling dirt for defendant, and had been, for several weeks. He used two wagons, one his own and the other was defendant's, and he would haul one load away while the empty one was being filled and then return for the latter. When hurt he was hauling a load with defendant's wagon. This wagon had a defect in that the "hammer strap" was not bolted or otherwise securely fastened to the tongue or pole of the wagon. A hammer strap was stated to be an iron strap a few inches long, with hole for a bolt at either end. On one end the bolt would run through the strap, through the double-trees and one through the tongue, the strap bending downward back towards the other end, a smaller bolt would run through the strap and

tongue. Being thus bolted to the tongue, the double-trees held to the tongue at the front end of the strap, could not pull off, neither could the bolt running through them pull out. In the strap in question here there was no bolt at the small end to hold it down to the tongue, and thus, unless remedied in some way, the double-trees at the other end were liable to pull out or off the tongue, especially if the wagon was loaded. To remedy the lack of a bolt, defendant had used a wire—common baling wire—with which the strap was tied or fastened to the tongue by being run through the hole where the bolt should be and thence through the tongue. Plaintiff says that he noticed this from the beginning of his work for defendant. That with heavy loads, at perhaps two difficult places, there was great danger of the wire giving way and thus allowing the other end of the strap to let the double-trees out, which would amount to detaching the horses from the wagon and thus start them suddenly ahead and jerk the lines from the driver or pull him off. That at several times this wire had given way and plaintiff had several times complained of such contrivance being used, and defendant's superintendent promised more than once that it should be fixed. He told him at one time when he complained of the wire, that it was safe. The evening before plaintiff asked that it be made secure and again received an affirmative promise. The next morning he was hurt in taking the first load. He saw that the wire was still in use. At one place in his testimony he said he did not notice, but in other statements he leaves no doubt but that he knew the wire was still in use. He drove up in his own wagon, but the other being loaded, he unhitched from his and hitched to the other. He says: "I drove in there and they had this wagon loaded at the pit. Of course, I just dropped off my wagon and hitched onto the load. We had to come about the distance of a block, and we came to a little hill that was

up grade, and just about the time the team made out to get up it—I had been standing on the top of the load; it was cold that morning, and I had hard work to hold the team. I had my lines wrapped around my hands— when I got up there the pin that held the double-tree broke, and the team just went forward like a flash of lightning and I was pitched for ten or fifteen feet. The wagon went back and the team forward."

He stated that he knew the wire was liable to give way any moment in pulling up the incline where he was hurt. He knew that by sitting down on the load there was no danger if it broke, but that by standing up there was danger of being dragged off the wagon by the sudden forward movement of the horses pulling the lines; but that if he would let go of the lines, even when standing on the load, he would be safe.

We thus have for a complainant a man of mature age and forty years experience as a teamster, necessarily with as full knowledge of a wagon, its gearing and its use, as any one could obtain. We have him with full knowledge of the defect in the contrivance to hold the double-trees and of the danger in using it. But more than that, while he knew of the liability of the wire to give way at any moment, he knew that to stand on the load was to put himself in the way of injury, when by sitting down he would be safe. But to add to what seems to have been entire indifference to danger, he not only stood up, but he had the lines wrapped around his hands, so that if the double-trees gave way and the horses "went forward like a flash" as he expressed it, he necessarily would be jerked off the wagon. He stated that if he had merely held the lines, though standing up, he could let go and probably would not get hurt. He admitted that he did not think of the matter of wrapping the lines around his hands, else he would not have done it.

It would be extremely hazardous to the employer

of any line of ordinary labor, like that of a teamster, if he should be held liable for mishaps to those in his employ, whose work is with such simple and common instruments that the employee must necessarily know as much (in many instances even more) than such employer.

In Blundell v. Manufacturing Co., 189 Mo. 552, 562, it is said that a laborer "who uses agricultural instruments while at work upon a farm or in a garden, or one who is employed in any service not requiring great skill and judgment and who uses the ordinary tools employed in such work, to which he is accustomed and in regard to which he has perfect knowledge, can hardly be said to have a claim against his employer for negligence, if in using a utensil, which he knows to be defective, he is accidentally injured. It does not rest with the servant to say that the master has superior knowledge and has thereby imposed upon him. He fully comprehends that the instrument which he employs is not perfect, and if he is thereby injured it is by reason of his own fault and negligence. The fact that he notified the master of the defect and asked for another instrument, and the master promised to furnish the same, in such a case, does not render the master responsible if an accident occurs."

In discussing this subject the Supreme Court said "Treating it as a question of contributory negligence the rule of law is that if the danger arising from the master's negligent act is so obvious that the servant, considering his capacity and opportunity, must have known and realized its degree, the court would declare his act of so continuing in his work contributory negligence as a matter of law, but if the peril was not so obvious, if the danger was such as to make it a question whether or not the servant, considering his capacity and opportunity of judging, might reasonably expect that

129 App—36

he could continue the service by exercising ordinary care, then it is a question for the jury." [Dakan v. Chase & Son Mercantile Co., 197 Mo. 238, 267.] As already shown, the plaintiff knew all the danger there was in the contrivance. He knew and in effect said that he could not continue to work with it safely, with ordinary care. But in addition to that, instead of using ordinary care, he chose the most careless conduct he could adopt by standing up on the load and wrapping the lines around his hands, so that he would almost necessarily be jerked off.

It is true that at one part of his testimony he said that he thought he could use the wagon safely. But that was a mere formal statement. His whole evidence shows that it was not true. It shows that he was not relying on any promise to remedy the defect, and his mere statement of a condition of mind ought not to control what patently appears otherwise. "If a certain state of mind is in issue, to allow a case to pass off on the mere *ipse dixit* of the person, that his mind was thus or so, would be to allow him to decide the case for himself, and the court and jury would have nothing to do but to enter a verdict." [Knorpp v. Wagner, 195 Mo. 637, 665.] As bearing, in some particulars of fact as well as law, on the case at bar, we refer also to a case in this court: Hicks v. Railway, 46 Mo. App. 304.

We think defendant's demurrer should have been sustained. We regard the judgment as without legal support and hence order that it be reversed. All concur.