## WILLIAM A. PEPPERS, Respondent, v. ST. LOUIS PLATE GLASS COMPANY, Appellant.

**St. Louis Court of Appeals, June 4, 1912.**

1. MASTER AND SERVANT: Complex and Dangerous Employment: Duty of Master to Warn. Where the shifting about of immense tables, amid the roaring noise and innumerable activities of a great shop, is complex and dangerous to employees working about them, and it is feasible and proper, by rule, regulation, sign, signal or watchman, to advise the servant in charge of their movement of the presence of employees working about them, or to warn such employees of the approach of danger, the duty rests upon the master to make such rule or regulation or provide such sign, signal or watchman.

2. ————: Injury to Servant: Complex and Dangerous Employment: Failure of Master to Warn: Question for Jury. In an action against a master for injuries to a servant by the shifting of an immense table while he was working under it, the shifting of which was complex and dangerous to employees, whether the master was guilty of negligence in failing to make a rule or regulation or provide a sign, signal or watchman to warn the servant in charge of the movement of the table of the presence of plaintiff under it, *held*, under the evidence, a question for the jury.
   *Held*, by REYNOLDS, P. J., dissenting, that the master was not guilty of actionable negligence in failing to provide means to give warning that the table was to be moved, since plaintiff knew how the work was being conducted and that the

table was liable to be moved at any time and the master was not required to keep a special watch over him and warn him of a common danger to which he was subjected in the performance of his ordinary duties.

3. ———: ———: **Contributory Negligence.** In order for a servant, injured by a defect in the appliances he uses, to be held guilty of contributory negligence as a matter of law, it must conclusively appear, that he not only knew of the defect, but also knew that present danger was to be apprehended therefrom.

4. ———: ———: ———. Where an employee was injured while working beneath a heavy table, he was not guilty of contributory negligence as a matter of law in not taking precautions against being injured by a sudden moving of the table, unless he knew that the table was liable to be moved while he was working beneath it, even though he knew no provisions had been made by the employer for warning his employees before the tables were moved.

5. ———: ———: ———: **Question for Jury.** In an action against a master for injuries to a servant by the shifting of an immense table while he was working under it, the negligence counted on being the failure of the master to provide means for warning the servant in charge of the movement of the table that plaintiff was underneath it, or for warning plaintiff that it was about to be moved, *held,* that there was no evidence tending to prove that plaintiff knew the table was liable to be moved while he was at work under it, and hence the question of whether he was guilty of contributory negligence in working under it, knowing no means of warning had been provided, was a question for the jury.

*Held,* by REYNOLDS, P. J., dissenting, that plaintiff knew of the dangers of his situation and that no warning would be given him before the table would be moved, and, therefore, that the duty devolved upon him to look out for the movement of the table, and, in failing to do so, he was guilty of contributory negligence as a matter of law. *Held, further,* that it was no excuse that he did not look or listen for the movement of the table because he was engrossed with his work, since a servant has no right to become so engrossed with his work as to be negligent of his own safety.

6. ———: ———: ———: **Burden of Proof.** In an action against a master for injuries to a servant, the burden is upon the master to show contributory negligence; it being presumed that the servant was in the exercise of due care for his own safety.

7. ———: ———: Assumption of Risk. An employee does not assume the risks that are the consequence of the employer's negligence.

8. ———: ———: Contributory Negligence: Instructions. In an action against a master for injuries to a servant by the shifting of an immense table while he was working under it, an instruction given for defendant, that if plaintiff had knowledge of the fact that the table under which he was working was likely to be moved without notice to him, or without notice to the servant in charge of the movement of the table that plaintiff was beneath it and was in danger of being injured thereby, then it was plaintiff's duty to use such care for his own safety as an ordinarily prudent man would have used under similar circumstances, and if he failed to use such care and relied solely upon some other person to warn him of approaching danger, he was guilty of contributory negligence and not entitled to recover, properly deals with the question of contributory negligence.

9. ———: ———: Instructions: Conflict. In an action against a master for injuries to a servant by the shifting of an immense table while he was working under it, held there was no conflict between the instructions given for the respective parties.

10. ———: ———: ———: Assumption of Risk: Instructions. In an action against a master for injuries to a servant by the shifting of an immense table while he was working under it, the negligence counted on being the failure of the master to provide means for warning the servant in charge of the movement of the table that plaintiff was underneath it, or for warning plaintiff that it was about to be moved, instructions offered by defendant that if plaintiff had knowledge of the defect in defendant's system at the time and before he began work beneath the table, or if he knew, at the time he was working under it, that it was liable to be moved and injure him, he assumed the risk, were properly refused, since, under the facts hypothesized, the defense was not assumption of the risk, but contributory negligence, and that defense was fully submitted in another instruction.

11. INSTRUCTIONS: Refusal: Covered by Other Instructions. It is not error to refuse an instruction which submits matters that are fully covered by other instructions given.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney*, Judge.

AFFIRMED.

Peppers v. Plate Glass Co.

*Richard F. Ralph* and *Rowland L. Johnston* for appellant.

(1) The demurrer to the evidence should have been sustained, because plaintiff was guilty of contributory negligence in failing to use his own senses and knowledge for his own protection. McGrath v. Transit Co., 197 Mo. 107; Clancy v. Transit Co., 192 Mo. 615; Wheat v. St. Louis, 179 Mo. 572; Hagar v. Railroad, 105 S. W. 744. (2) Rules and regulations are not intended to displace ordinary prudence. Poindexter v. Paper Co., 84 Mo. App. 352. (3) Both upon principle and authority it is clear that a master cannot be deemed culpable on the ground of an omission to give warning, where the servant already possesses sufficient knowledge of the conditions to enable him to take appropriate precautions for safe-guarding himself. 1 Labatt, Master and Servant, p. 455; Greenwald v. Railroad, 49 Mich. 197; Nyz v. Railroad, 178 Pa. 134. (4) The verdict of the jury was against the law and the evidence, and should have been set aside and a new trial granted. Payne v. Railroad, 129 Mo. 405; Lawson v. Mills, 130 Mo. 170. The weight of testimony in favor of defendant is so conclusive as to indicate passion or prejudice in the verdict for plaintiff. Whitrell v. Ransom, 79 Mo. 258; Garrett v. Greemsell, 92 Mo. 120. (5) The court erred in giving plaintiff's instructions 1, 2, 3, 4. (6) The court gave conflicting instructions which rendered them unintelligible to the jury. No. 3 given for defendant is in conflict with Nos. 1, 2, 3 and 4 given for plaintiff. To give such conflicting instructions is error. D'Lauhi v. Railroad, 105 Mo. 645; White v. Ins. Co., 93 Mo. App. 282. (7) The court erred in refusing to give proper instructions requested by defendant. Duerst v. Stamping Co., 163 Mo. 607; Stanfield v. Loan Assn., 53 Mo. App. 595.

*J. C. Kiskaddon, R. L. Shackleford* and *A. H. Kiskaddon* for respondent.

(1)  Cases relating to the negligence of travelers in crossing railroads have no application to the relation of master and servant.  Day v. Emery, Bird & Thayer, 114 Mo. App. 479.  (2)  A servant assumes only such risks as are ordinarily incident to his employment.  Dakan v. Chase, 197 Mo. 238; Obermeyer v. Chair Co., 120 Mo. App. 59; Brady v. Railroad, 206 Mo. 509; Naughton v. Gaslight Co., 123 Mo. App. 192; Francis v. Railroad, 127 Mo. 655; Railroad v. Eberhardt, 43 S. W. 510.  (3)  The law requires a master to furnish a reasonably safe working place for a servant.  Day v. Emery, Bird & Thayer, 114 Mo. 479; Railroad v. Eberhardt, 43 S. W. 510.  (4) The servant has a right to rely upon his master to perform that duty.  Railroad v. Eberhardt, 43 S. W. 510; Webb's Pollock on Torts, p. 591.  (5)  The position of the servant is one of subordination and obedience to the master, and he has the right to rely upon the superior knowledge and skill of his master.  The servant is not entirely free to act upon his own suspicion of danger.  Shorter v. St. Joseph, 104 Mo. 114; Railroad v. Eberhardt, 43 S. W. 510.  (6)  Where the master is negligent in furnishing the servant an unsafe place to work, the servant does not assume the risk of injury by such negligence, although he knows or by the exercise of ordinary care could have known, that the place was unsafe.  Brady v. Railroad, 206 Mo. 509; Dakan v. Chase, 197 Mo. 238; Naughton v. Gaslight Co., 123 Mo. App. 192; Obermeyer v. Chair Co., 120 Mo. App. 59; Butz v. Murch Bros., 199 Mo. 279; Francis v. Railroad, 127 Mo. 658; Hamman v. Coal Co., 156 Mo. 232.  (7)  The neglect of the master to provide a reasonably safe place does not convert the master's negligence into an assumption of risk by the servant unless the danger be glaring and imminent.  Butz v. Murch

Bros., 199 Mo. 279; Naughton v. Gaslight Co., 123 Mo. App. 192; Wendler v. Furnishing Co., 165 Mo. 527; Dakan v. Chase, 197 Mo. 238; Pauck v. Co., 166 Mo. 639; O'Mellia v. Railroad, 115 Mo. 205; Hamman v. Coal Co., 156 Mo. 232; Shortel v. St. Joe. 104 Mo. 114. (8) The knowledge of the servant as to the condition of the place where he works is a fact for the jury to consider under a plea of contributory negligence; and is a question for the jury and not for the court as a matter of law, unless the danger is so glaring and imminent that no man of ordinary prudence would undertake the work. O'Mellia v. Railroad, 115 Mo. 205; Pauck v. Co., 166 Mo. 639; Francis v. Railroad, 127 Mo. 658. (9) It is not necessary to plaintiff's recovery that the defendant should have forseen the particular injury which resulted to him. It is sufficient if the injury as it occurred was such as might have been forseen and avoided by the exercise of reasonable prudence on defendant's part." Brady v. Railroad, 206 Mo. 509; Dean v. Railroad, 199 Mo. 411.

STATEMENT.—This is an action by the plaintiff against the defendant to recover damages for personal injuries received by the plaintiff on account of the negligence of the defendant. The plaintiff had verdict and judgment for seven thousand dollars and defendant has appealed. Plaintiff was injured by a "table" (which ran on wheels like a car) being moved while he, as an employee of the defendant, was adjusting a clamp underneath. The charges of negligence, made in the petition and submitted to the jury, consisted, first, in defendant's failure to adopt any rules and regulations for the control of motormen so as to secure the safety of men working under the tables; second, in defendant's failure to provide any signal or sign that would indicate to the motorman that a man was under the table; third, in defendant's failure

to leave a watchman by the table to warn the motorman that a man was under the table. The answer contained a general denial and pleas of contributory negligence and of assumption of risk. The reply was a general denial.

The day plaintiff was injured, April 12, 1907, the defendant corporation operated a large glass manufacturing plant at Valley Park, Missouri. The grinding and polishing room was 595 feet long from east to west and 135 feet wide from north to south. In this great room six large engines, with shafting, operated eight grinding and eight polishing machines; the grinding being done toward the western part of the room, the polishing more toward the eastern part. A large number of men were employed in this room. In order to be ground and polished, the rough glass was laid (with cement or plaster of paris to hold it in place) upon circular "tables," twenty-five feet in diameter, which rested on trucks and car wheels which ran on tracks with steel rails. The rails, there being two to each track, were twelve feet apart, so that the flat tops of the tables projected out several feet over each rail. The tables were low, the tops not quite reaching to a man's waist line. In the room were thirty-one such tables and eleven tracks on which they ran. These tracks ran north and south and parallel to each other. When the glass on a table was being ground, the table stood on a track by a grinding machine. When the grinding was complete, the table was moved to another track next to a polishing machine. When the polishing was complete, the table was moved to another track in a part of the room, called the "stripping yard," which was in the extreme eastern end of the room, and there the table was "stripped" —that is, the glass was removed from it. When a table was "stripped" it was, when needed, again moved back onto a track by a grinding machine to go through the same process as before.

The manner or means of moving the table from track to track as aforesaid was as follows: East and west, the long way of the room, across all the eleven tracks at right angles, was a depressed track. Along this depressed track ran two "transfer cars" operated by electricity, upon each of which were laid two rails, which ran in the same direction and were the same distance apart as the table track rails and were on a level therewith. A motorman stood on a little platform at one end of the transfer car and operated it by means of a controller and a lever. When a table was to be moved from one track to another, a transfer car was run down the depressed track to a point opposite the end of the track on which the table stood, and stopped so that the ends of the rails on the transfer car exactly fitted to the ends of the rails of the table track. A man on the transfer car, called a "rope puller," stepped off the transfer car carrying the end of a rope with a hook attached, the other end being fastened to a spool operated by electricity on the transfer car. He attached the hook to a ring in the end of the table, whereupon the motorman by starting the spool to revolving and winding the rope upon it, pulled the table onto the transfer car. Then the motorman ran the transfer car with the table on it down to a point opposite the track on which it was desired to place the table, and the table was pulled off the transfer car onto such table track. This moving and shifting of tables from one track to another by means of transfer cars was almost constantly going on. When the men at the grinders or polishers wanted a table taken away or a new one brought, they would so indicate by blowing a whistle, whereupon the men on the transfer car would go and get the table and take it away or bring a cleaned one from the "stripping yard" as the case might be. This whistle blowing did not indicate what particular table was to be brought. That was to be determined solely by the

transfer men themselves. It was the invariable custom for those on the transfer car to take from the "stripping yard" only tables which had been entirely "stripped," that is, tables from which all glass had been removed, as, of course, no others were available for the use they were necessarily to be put. The sole test of whether a table was to be moved was its having been "stripped," to be determined by looking at the surface of the table. Each transfer car was provided with a gong to be rung as a warning to clear the way as it went to and fro along the depressed track carrying a table wider than itself. There were two tracks in the "stripping yard" on which tables rested while the glass was being taken off or awaiting or following that event.

The engines, grinders, polishers and other machinery as well as the men at their work combined to make a great noise which pervaded the entire room and was described by defendant's foreman as a roar. This noise was especially great at the "stripping yard."

Plaintiff began to work for the defendant ten days before he was injured. He was unfamiliar with machinery and with glass manufacturing, never having been in a glass factory before. He so informed defendant's foreman at the time of his hiring. The foreman assigned him to miscellaneous common labor. One whole day he acted as a "rope puller" and on cross-examination he testified that, while so acting, he had taken no precautions to ascertain whether anyone was under a table about to be "pulled," or to warn such a one, and that he had received no instructions to take any such precautions or to give any such warning, neither had he observed any signals indicating the presence of anyone under any table. On other days, he worked as helper at divers tasks in the grinding and polishing room, having opportunity to observe the transfer cars and their operations. It does not ap·

pear that any person other than the plaintiff went under any table while he was in the employ of defendant. Three days before plaintiff was injured, the foreman assigned him to work in the "stripping yard," adjusting or replacing certain clamps on the under side of all the tables, and greasing the wheels, telling him to keep at this work until otherwise ordered. This was a work which had to be done from time to time in the course of defendant's business. The foreman gave him no instructions or information, as to rules or regulations, but crawled under the first table with him to show him how to do the work. As we have already mentioned, the tables were twenty-five feet in diameter and only about three and one-half feet high. As the rails were only twelve feet apart, and the table top circular, the latter projected out several feet beyond the wheels and trucks. The clamps were underneath, between the rails and inside the space formed by the trucks and wheels. In order to fix them, the plaintiff was compelled to get down and crawl in under and sit on the ground humped over.

On April 12, 1907, between eight and nine o'clock in the morning, plaintiff had finished with one table and was about to start on another, located, like all he had worked on, in the "stripping yard." He knew that it was the custom to move tables when they were "stripped" and not before. Before crawling under this second table, plaintiff noticed that it was still "unstripped" and that no one was "stripping" it or seemed to be about to do so. He crawled under and sat humped over between the tracks and wheels. It would take twenty-five minutes to finish that table. While he was so engaged men came and commenced to "strip" the glass off the top of the table. The head grinder asked the transfer men to bring a "stripped" table. The transfer car came to the point opposite the tracks on which stood the table plaintiff was work-

ing on.    The "strippers" were just finishing their work on that table.    The "rope puller" jumped off and fastened the hook in the ring on the table and signalled the motorman to start the spool and pull the table.    All this was without distinguishable sound to plaintiff, by reason of the roaring general noise which filled the great room.    He was working on a clamp, so located that he had to sit with his back toward the point where the transfer car track was. Plaintiff, testifying, gave it as his opinion that he would have had to turn around and stoop further down to look out for a transfer car, but from other evidence in the case we deem it questionable whether he could have seen even then, on account of the trucks, wheels and machinery under the table.    He could not have heard if he had listened.    He did not turn around to look.    He did not try to listen.    In two more minutes he would finish with that car.    The foreman was nowhere around.    There was no sign or signal or other warning to indicate to the men on the transfer car that any one was underneath the table or to indicate to the plaintiff that the car was apt or about to be moved.    The spool revolved; the table moved.    It struck plaintiff's shoulder, shoved him around and threw his leg across the track.    He called out, but his voice was not heard.    The wheel ran over his leg and cut it off.

The whole case concedes that the defendant had provided no rules, regulations, signals, signs, watchman or other means to warn the transfer car motormen of the whereabouts of an employee working under the tables or to warn such employees of the approach of danger, and had provided no system whatever for the protection of employees in the dangerous position in which plaintiff was working when injured.

The first three instructions given at the instance of the plaintiff severally submitted to the jury the question of whether the defendant was guilty of negli-

gence in any of the three particulars assigned and permitted a recovery by the plaintiff if the negligence of defendant in any of such particulars caused the plaintiff's injury, without any fault on his part. The fourth declared in effect that the plaintiff did not assume the risks of his employer's negligence, if any. The instructions given at the instance of the defendant, so far as we need notice them, were as follows:

No. 2 in effect declared that plaintiff could not recover if he was injured in consequence of choosing a dangerous, in preference to a safe, way to perform the work, when both ways were equally available and known to him.

"No. 3. The court instructs the jury that if you find and believe from the evidence that the plaintiff had knowledge of the fact, if you find it to be a fact, that the car under which he was working at the time he was injured was likely to be moved without notice to him, or without notice to operators of the motor car mentioned in the evidence, that plaintiff was beneath said table, and that he was in danger of being injured thereby, then it was the duty of plaintiff to use such care for his own safety, as an ordinarily prudent man would use under similar circumstances, and if the plaintiff failed to use such care for his safety, and relied solely upon some other person or persons to warn him of approaching danger, then the court instructs you plaintiff was guilty of contributory negligence, and your verdict must be for defendant."

The court refused to give an instruction in the nature of a demurrer to the evidence offered by the defendant and also refused to give instructions Nos. 2, 3, and 6 offered by the defendant. No. 2, so refused, declared in effect that if plaintiff had knowledge of the defect in defendant's system at the time and before he began work beneath the table, then he assumed the risk of being injured on account thereof. No. 3, so refused, declared that if plaintiff knew at the time

he was working under the table that it was likely to be moved without warning and injure him, he assumed the risk. No. 6, so refused, was as follows:

"No. 6. The court instructs the jury that while it is the duty of the master to exercise reasonable care to promulgate and enforce reasonable rules for the protection of its servants, where the exposure is such that ordinary care requires them, yet the court instructs you that the master is not bound to provide against all risks which are so open and obvious that the servant by the exercise of ordinary care can protect himself against them, and the court instructs you that if you find and believe from the evidence that while on April 12, 1907, plaintiff was working beneath the table mentioned in the evidence, the risks of injury to himself were so open and obvious that the plaintiff could and should, by the exercise of ordinary care, have protected himself against them, and further find that by exercising ordinary care by looking he could have seen the motor car mentioned in the evidence, or by listening, could have heard the said car in time to have avoided being injured when it pulled the said table, and negligently failed to look or listen for the approach of said car, or if he did look or listen, but failed to heed what he saw or heard, or find that plaintiff by the exercise of ordinary care with the use of means at hand, if any, could have prevented the moving of said table without warning to himself or have apprised the persons in charge of such car of his presence under the table, then your verdict must be for the defendant company."

CAULFIELD, J. (after stating the facts).—I. The trial court very properly refused to give the demurrer to the evidence. The testimony certainly tended to prove that the shifting about of these immense tables amid the roaring noise and innumerable activities of a great shop was complex and dangerous, peculiarly dan-

gerous as to an employee working under them, and that it was feasible and proper by rule, regulation, sign, signal or watchman to advise its motormen engaged in moving the tables of the whereabouts of employees working under them or to warn such employees of the approach of danger. This was sufficient to show a case where the duty to make such rule or regulation or provide such sign, signal or watchman, rested upon the employer   (Reagan v. Railroad, 93 Mo. 348, 6 S. W. 371; 1 Labatt on Master & Servant, sec. 219), and whether the defendant was guilty of negligence in that respect was a question for the jury. [Reagan v. Railroad, supra.]

Defendant appears to concede this, but asserts that by reason of plaintiff's brief employment around the shop he must have known that no such precaution had been taken by his employer for his protection, and that, being possessed of such knowledge, his going and remaining under the table without taking precautions on his own account against being injured by a movement of the table, was contributory negligence as matter of law. We doubt whether the proof is conclusive that the plaintiff had the knowledge which defendant would thus impute to him, but if it be granted that he had such knoweldge, it does not necessarily follow that he was guilty of negligence as matter of law. In order to convict the plaintiff of negligence as matter of law in not taking precautions against being injured by the moving of the table, it should conclusively appear, not only that he knew, or in the exercise of ordinary care should have known, that no one would take such precautions unless he did, but also that he knew or in the exercise of ordinary care should have known, that the table was *liable to be moved* during the time he would be engaged in his work under it. In other words he must have known not only of the defect but of the present danger to be apprehended therefrom. [Heberling v. City of Warrensburg, 204

Mo. 604, 614, 103 S. W. 36.] Now it was the custom, as plaintiff knew, not to move a table as long as it remained "unstripped" of glass, and when he went under this table it was "unstripped," and was not being "stripped;" neither was there anything to indicate that it was about to be "stripped." There is nothing in the record to show that plaintiff knew or by the exercise of ordinary care should have known that the table could be stripped and made ready for moving during the twenty-five minutes he would be at work. The presumption, which the law indulges, that he was in the exercise of care for his own safety, negatives the idea that he had such knowledge or was negligent in not having it. The burden was on the defendant to prove the contrary and it failed to sustain it. It was certainly entitled to nothing more than to have the question of plaintiff's contributory negligence submitted to the jury, as was done. We regard this conclusion as being in perfect accord with the third instruction given at the instance of the defendant, which defendant's counsel say in their brief is a correct statement of the law under the evidence.

II. The defendant's contention that instruction No. 3, given at its instance, is in conflict with the first four instructions given at the instance of plaintiff is without merit. The first three of plaintiff's instructions dealt with defendant's negligence alone except that they made plaintiff's recovery dependent upon his having been injured "without any fault on his part." The fourth declares nothing more than that an employee does not assume the risks which are the consequences of his employer's negligence, a doctrine well established in this state. The defendant's instruction No. 3 properly deals with the question of plaintiff's alleged contributory negligence and negatives his right to recover if found guilty thereof. We have discovered no conflict between these instructions

and defendant has failed to suggest wherein such conflict exists.

III. The trial court did not err in refusing to give defendant's refused instructions Nos. 2 and 3. The question was not of assumption of risk but of contributory negligence which defendant's given instruction No. 3 properly presented to the jury.

IV. We need not determine whether the defendant's instruction No. 6 was or was not erroneous. It is sufficient to say that without it the jury was fully and properly instructed as to every phase of the case.

The judgment is affirmed. *Nortoni, J.,* concurs. *Reynolds, P. J.,* dissents in separate opinion.

## DISSENTING OPINION.

REYNOLDS, P. J.—I am unable to concur in the conclusion arrived at by my learned associates in this case.

Plaintiff's own testimony shows that he knew the conditions sourrounding the work in which he was engaged; knew that this motor car was apt to come down its tracks, be attached to the stripping table under which he was working at any time and to move and draw it out. He knew that no watchman was kept at the table, nor on the motor, to warn those at work; he had himself worked on the motor a few days before, in pulling it down the track, and knew how it was operated. He sat or crouched under the stripping table with his leg across the track over which that table was liable to be moved at any time. He was working in a shop where the noise of machinery was bound to render it difficult to hear the apparoch of the motor. He knew that no watchman was there to warn him of its approach, and hence he was bound to look out for his own safety under surroundings, all of which were

apparent and well known to him. It was not necessary that he should be a skilled employee, or one of long experience in the work, to know its dangers. To a man of the most ordinary sense and prudence, it must have been known that the place and conditions under which he was at work required that a lookout be kept for his own safety. He had no right to be lulled into security by waiting for the warning voice of anyone; he knew no one on guard for that purpose; that no warning was ever sounded, and that the motor moved up and down its tracks without anyone being there to give notice of its approach. All this is clear from plaintiff's own testimony. I am compelled to the conclusion that his own carelessness directly contributed to his misfortune.

But plaintiff says he was so engrossed in his work that he neither watched nor listened.

In McGrath v. St. Louis Transit Co., 197 Mo. 97, 94 S. W. 872, at pages 107 and 108 it is said: "It was the duty of the deceased to use his sense of sight and sense of hearing for his own protection. He had no right to become so engrossed in his work, if he was so engrossed, as to be negligent of his own safety." That is the rule recognized in many cases.

Nor was the employer guilty of actionable negligence toward this plaintiff by reason of a failure to have watchmen stationed around the works to give warning of the approach of the motor. Plaintiff knew the conditions under which the work was there conducted; he knew that the car at which he was working was liable to be moved at any time and without warning. Regard for his own safety should have prevented him from throwing his leg across the track over which he knew the wheels of the car were bound to pass if that car was pulled out by the motor. Under such conditions the employer "is not required to keep special watch over his employee and warn him of common dangers to which he may be subjected in the perform-

ance of his ordinary duties." [1 Labatt on Master and Servant (Ed., 1904), sec. 209a.]

In Ring v. Mo. Pac. Ry. Co., 112 Mo. 220, 20 S. W. 436, our Supreme Court has said (l. c. 230), speaking of laborers on a railroad track: "The situation was not one of unusual danger, nor one not ordinarily incident to the work they were employed to perform. . . . He (plaintiff) had worked on the road nine or ten years, with trains passing frequently during every day, and was famaliar with all the dangers; no rules were shown which absolved the laborers from watching for themselves for passing trains, or that imposed upon the foreman. the duty of watching and warning them of the ordinary danger from passing. trains. Under these circumstances a rule that would impose upon the master the duty of watching each individual workman, and warning him of the passing of every train, and of keeping him out of danger, would be an abrogation of the well-recognized and necessary rule, that the servant, when engaged in his master's service, assumes all the risks ordinarily incident to the discharge of the duties he undertakes to perform; and would make the master an insurer of the safety of his servants." It is true that in the case at bar, the employment had been his but a few days before the accident, but the evidence of plaintiff himself shows that it had been long enough to acquaint him with the exact conditions attendant upon it, that he was familiar with the dangers of his situation, and here, as in the Ring case, not only were no rules nor even a custom shown that absolved the laborers in this plant from watching for themselves for the approach of the motor. So far from that being the case, plaintiff counts on the absence of rules as negligence. I cannot agree that it was, no rule or custom providing for them.

It is true that our Supreme Court in Reagan v. St. Louis, K. & N. W. Ry. Co., 93 Mo. 348, 6 S. W. 371,

a case cited by my Brother Caulfield, does lay down the rule that one who employs servants in a complex and dangerous business ought to prescribe rules sufficient for its orderly and safe management, and that his failure to do so is a personal neglect for the consequences of which he will be liable to his servants. But I do not understand that this plaintiff was employed in a complex or dangerous business, in an employment any more dangerous than any employment connected with the operation of machinery can be said to be dangerous. It seems to me that the employment in this case is more of the class referred to in Ring v. Mo. Pac. Ry. Co., supra, than in Reagan v. St. Louis, K. & N. W. Ry. Co., supra. Hence I think that the rule laid down in the former case is the one that should here govern.

Learned counsel for respondent refer to Dakan v. Chase & Son Mercantile Co., 197 Mo. 238, 94 S. W. 944, and like cases as prescribing the duty of the employer to furnish a safe place to work. That duty is clear, but the facts in judgment in the Dakan case are entirely different from those at bar. Moreover, those counsel at the trial abandoned the assignment of negligence founded on the charge that plaintiff had been sent into a dangerous and perilous place to do his work. In their printed brief and argument counsel say in so many words: "The place into which the plaintiff was sent was perfectly safe, and would so appear to an ordinarily prudent man, until, without notice to the plaintiff, it was suddenly rendered perilous by a negligent act of the master." The negligent act of the master here complained of is the failure to warn plaintiff or to warn those in charge of the motor of plaintiff's presence. As before remarked, even conceding such failure, plaintiff knowing that no rule required such warning to be given, was not absolved from ordinary vigilance against an obvious danger. He assumed its risks.

I think the demurrers should have been sustained and that the judgment of the circuit court should be reversed.